UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE J.R. CLARKSON COMPANY LLC,

    Petitioner,

- against -

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

    Respondent.

23 Civ. 10252

---

**PETITION TO ENJOIN ARBITRATION AND FOR DECLARATORY RELIEF**

**LATHAM & WATKINS LLP**

Robert J. Gilbert\*
Nathan A. Sandals\*
Caitlin E. Feeney
200 Clarendon Street
Boston, MA 02116

Paul T. Moura
1271 Avenue of the Americas
New York, NY 10020

*Attorneys for the Petitioner,*
*The J.R. Clarkson Company LLC*

\**Pro hac vice* forthcoming

Petitioner The J.R. Clarkson Company LLC, by and through its attorneys, Latham & Watkins LLP, for its Petition against Respondent, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") alleges as follows:

## NATURE OF ACTION

1. Petitioner brings this action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, Rule 57 of the Federal Rules of Civil Procedure, and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4, to address the improper demand for arbitration served on J.R. Clarkson by Defendant National Union Fire Insurance Company of Pittsburg, Pennsylvania on August 25, 2023 (the "Arbitration Demand") (Exh. 27 hereto).

2. The Arbitration Demand is actually two demands. Both are improper and should be enjoined.

3. ***First Demand for Arbitration:*** The first demand seeks arbitration of a payment dispute pursuant to an alleged contract—the "Putative 1989-90 Indemnity Agreement"—that has never been located, might never have existed, and whose terms are anybody's guess. This first demand fails for two reasons:

    a. **No Agreement to Arbitrate:** Contrary to foundational principles of arbitration law, National Union has not and cannot establish that J.R. Clarkson ever agreed to arbitrate the payment demand.

    b. **The Arbitration Clause Alleged by National Union Would Not Encompass the Payment Dispute:** National Union posits that the Putative 1989-90 Indemnity Agreement, if it exists, would require arbitration of disputes involving "the interpretation of [the Indemnity] Agreement." Accordingly, that arbitration clause

would not encompass the payment dispute, which involve "application" and "enforcement" of the alleged agreement.

4. ***Second Demand for Arbitration:*** National Union's second demand relates to unidentified "disputes" arising under various Pre-1989 Indemnity Agreements. Those contracts contain narrow arbitration clauses applicable only to disputes involving "the interpretation of [the Indemnity] Agreement." National Union has not identified a single dispute arising out of interpretation of the agreements. In fact, National Union has not identified any disputes at all under those agreements, let alone anything that the parties agreed to commit to arbitration.

5. ***J.R. Clarkson's Request for Declaratory Relief:*** Based on the foregoing, J.R. Clarkson seeks the following declaratory relief.

6. As to National Union's first arbitration demand, J.R. Clarkson seeks the following declarations, pursuant to 28 U.S.C. §§ 2201 and 2202, Rule 57, and the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, that:

    a. National Union has failed to establish the existence or terms of the Putative 1989-90 Indemnity Agreement;

    b. The Putative 1989-90 Indemnity Agreement, if it exists, does not contain an arbitration clause;

    c. The 1989-90 Indemnity Agreement, if it exists and contains an arbitration clause, only requires arbitration of disputes involving the "interpretation" of that agreement, and therefore does not require arbitration of the payment dispute identified in the August 25, 2023 Arbitration Demand; and

  d.  The Putative 1989-90 Indemnity Agreement, if it exists and if its terms can be proven, does not require J.R. Clarkson to pay the $2 million sum demanded by National Union under that alleged agreement.

 7. As to the second demand in National Union's August 25, 2023 Arbitration Demand, J.R. Clarkson seeks a declaration that this second demand does not identify any disputes that fall within the scope of any of the Pre-1989 Indemnity Agreements identified in the Arbitration Demand.

 8. Petitioner further seeks preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure barring National Union from pursuing any arbitration against it with respect to the matters identified in the August 25, 2023 Arbitration Demand. Such relief is appropriate under long-standing FAA principles holding that irreparable harm results when parties—like Petitioner here—are forced to arbitrate matters that they never agreed to submit to arbitration.

 9. Petitioner also seeks an award of attorney's fees and costs, and such other and further relief as may be available.

## PARTIES AND JURISDICTION

 10. This matter arises under the Court's diversity jurisdiction, as the parties are completely diverse and the amount in controversy is $2 million, based on National Union's demand to arbitrate a payment dispute in that amount.

 11. Petitioner J.R. Clarkson is a limited liability company. As a limited liability company, J.R. Clarkson's citizenship is determined by the citizenship of its members. The sole member of J.R. Clarkson is Emerson Final Control US Holding LLC ("ECF LLC"). In turn, the sole member of ECF LLC is an entity known as Flow Control US Holding Corporation ("Flow

Control"). Flow Control is incorporated in the state of Delaware and is a holding company whose President and Chief Financial Officer are citizens of Iowa.

12. Upon information and belief, Respondent National Union is a Pennsylvania corporation and maintains its principal place of business in New York.

13. National Union is subject to personal jurisdiction of this Court and venue is proper here because National Union has demanded arbitration against Petitioner before an arbitration panel seated in New York, New York. Further, because National Union maintains its principal place of business in New York, it is subject to general personal jurisdiction in this Court.

## FACTUAL BACKGROUND

### Relevant Corporate History of Geosource, Moorco and J.R. Clarkson

14. J.R. Clarkson is the successor-in-interest to an entity previously known as Moorco.

15. The relevant corporate history of this matter involves three entities: (a) Geosource, Inc., (b) Moorco and (c) the Petitioner, The J.R. Clarkson Company LLC.

16. At various times beginning in the 1980s, all of these entities owned, directly or indirectly, an entity now known as Crosby Valve, LLC ("Crosby Valve"). Crosby Valve has been the defendant in thousands of lawsuits alleging injurious exposure to asbestos in products manufactured, distributed or sold by Crosby Valve.

17. In 1981, Geosource acquired Crosby Valve.

18. In May 1984, Moorco International, Inc. ("Moorco") acquired Crosby Valve from Geosource. In 1995, FMC Corporation became the ultimate corporate parent of Crosby Valve and Moorco.

19. In 1998, Tyco became the ultimate corporate parent of Crosby Valve and Moorco.

20. In 2001, during the Tyco period of ownership, Moorco merged with and into CV Holding, Inc. In 2009, CV Holding, Inc. merged with and into J.R. Clarkson.

21. By reason of the foregoing, Petitioner J.R. Clarkson is the current successor-in-interest to Moorco.

22. In 2012, Pentair became the ultimate parent of J.R. Clarkson and Crosby Valve.

23. Since 2017, Emerson Electric Co. has been the ultimate parent of J.R. Clarkson and Crosby Valve.

### The Insurance Program Issued by National Union to Geosource and Moorco in the 1980s

24. For eight policy periods beginning October 1, 1982-83 and continuing until at least May 31, 1989-90, National Union issued a broad program of third-party liability insurance coverage to Geosource and then to Moorco.

25. This program of insurance included automobile liability insurance, workers' compensation insurance and (relevant to this Petition) commercial general liability ("CGL") insurance. The CGL Policies in this program obligated National Union to defend and indemnify Moorco and its subsidiaries, including Crosby Valve LLC ("Crosby Valve"), against various third-party suits, including product liability claims.

26. Over its eight-year course, National Union's insurance program evolved and varied in numerous ways. Some of these changes are described here.

27. **Limits of Coverage:** The various amounts of coverage that National Union was willing to write changed over the years. For example, the limits of liability for products liability fluctuated from year to year, with per occurrence and aggregate limits of $1,000,000 for the years 1982-83 to 1986-86; $3 million per occurrence and aggregate in 1987-88 and 1988-89; and $2 million in 1989-90. *See* Exhs. 1–11, CGL Policies.

6

28.     **Cost of Coverage:** Premiums likewise fluctuated substantially from year to year. For example, the premium for CGL coverage (including products liability) ranged from a high of $666,289 in 1984-1985 to a low of $156,378 in 1986-1987. *See* Exh. 3, 1984-85 CGL Policy at 2; Exh. 5, 1986-87 CGL Policy at 1.

29.     **Exclusions:** The exclusions found in the different policies varied from policy to policy. For example, early policies contained limited pollution exclusions with exceptions for sudden and accidental releases; later policies contained somewhat broader pollution exclusions with different exceptions, such as releases caused by hostile fires.

30.     **Policy Conditions:** The exact form of the policies and their various endorsements also changed over time. For example, while the 1984-1985 policy does not contain an additional condition concerning arbitration, the 1986-1987 policy contains a condition that allows the insurer to exercise all of the insured's rights in the choice of arbitrators and the conduct of an arbitration proceeding.

31.     **Definition of "Insured":** From year to year, the policies not only contained different lists of "Named Insureds" but also used different definitions of persons or entities who would qualify as named insureds, additional insureds or other insureds even if not expressly identified. *See* Exh. 6, 1987-88 CGL Policy at 4–5; Exh. 7, 1988–89 CGL Policy at 10–11.

32.     **The Switch from Nationwide to Regional CGL Policies:** For the first seven years of the program (1982-83 through 1988-89), National Union's program provided a single CGL Policy applicable on a nationwide basis. This changed substantially in the 1989-90 policy year, when National Union issued three different CGL policies, each with its own premium and each providing $2 million per occurrence and in the aggregate. One policy applied to Texas; a second

policy was issued for Massachusetts and New Jersey; and the third applied to all other states. *See* Exhs. 9–11, Excerpts of 1989-90 CGL Policies.

33. **The Adoption of "Anti-Stacking"/Non-Cumulation Clauses:** Unlike the policies in the prior seven periods, the 1989-90 CGL Policies included a so-called "Anti-Stacking" endorsement that (as held in a Massachusetts summary judgment ruling between Crosby Valve and National Union) had the effect of telescoping coverage into the 1989-90 policy year with respect to "long-tail" liabilities that triggered multiple CGL policies in the 1989-90 policies and earlier policy years.[1]

34. **Pure Insurance Versus Partial "Fronting":** In the first coverage period (October 1, 1982-83), National Union provided pure insurance coverage. Over the next six periods, the insurance program was a partial "fronting arrangement," meaning that the various policies provided coverage for defined third-party losses, but Geosource (in 1983-84) and Moorco (for the periods from 1984-85 to 1988-89) agreed to reimburse some of the amounts paid by National Union. The scope and terms of this partial reimbursement arrangement was achieved through so-called "Indemnity Agreements," entered into concurrently with, and explicitly referencing and incorporating the terms of, the various workers compensation, CGL, and auto-liability policies being issued to Geosource and then Moorco.

---

[1] Coverage litigation is pending in Massachusetts state court involving the scope of National Union's obligation to defend and indemnify thousands of product liability suits alleging injurious exposure to asbestos in Crosby Valve's historical products. *See Crosby Valve, LLC et al. v. OneBeacon America Ins. Co. et al.*, 1284CV02705 (the "Coverage Action"). The referenced summary judgment ruling is attached as Exh. 20 hereto.

35.     This partial fronting arrangement was effectuated by a series of "Indemnity Agreements" (the "Pre-1989 Indemnity Agreements") that were entered into concomitantly with the CGL, auto, and workers-compensation policies.

36.     The terms and conditions of the Pre-1989 Indemnity Agreements from 1983-84 to 1988-89 varied materially from year to year. The key differences included, but were not limited to, the amount of claim payments that Geosource or Moorco would be required to indemnify, whether such claim payments were due for every occurrence or just specified occurrences, whether the total amount due in any year was subject to per-occurrence limits and/or aggregate limits, and the terms of various arbitration clauses found in the Pre-1989 Indemnity Agreements.

37.     For instance (and as only an illustration of the myriad differences in annual terms and conditions), the 1987-88 Indemnity Agreement changed the Self-insured Retention ("SIR") to $250,000 (as opposed to $150,000 in the 1986-87 agreement) and required Moorco to assume allocated loss expenses up to the SIR in certain cases. *See* Exh. 16, 1987-88 Indemnity Agreement at 6–7. The 1987-88 Indemnity Agreement also changed the introductory language to exclude indemnity for liability incurred from National Union's negligent acts. *See* Exh. 13, 1984-85 Indemnity Agreement at 4; Exh. 16 at 6. Additionally, many of the Indemnity Agreements contain different language laying out the purpose of the agreement. *See* Exh. 13 at 1–2; Exh. 16 at 1; Exh. 17, 1988-89 Indemnity Agreement at 1.

38.     By way of further example, the Indemnity Agreements varied substantially in the manner in which they treated Geosource's or Moorco's responsibility for so-called "Allocated Loss Expenses." For example, the 1987-88 and 1988-89 Indemnity Agreements capped their exposure at $250,000 per occurrence; the 1983-84 Indemnity Agreement capped their exposure at the relevant self-insured retention for a particular coverage; and the other Indemnity Agreements

appeared not to cap their exposure. Additionally, while the 1983-84 and 1984-85 agreements contain an Aggregate Stop-Loss Premium of $20,000, the 1985-86 agreement allows for a $40,000 Aggregate Stop-Loss Premium and the 1986-87 agreement allows for a $60,000 Aggregate Stop-Loss Premium. The 1987-88 and 1988-89 agreements make no mention of an Aggregate Stop-Loss Premium. *See generally* Exhs. 16, 17.

39.     The arbitration clauses in the various Pre-1989 Indemnity Agreements also varied. For example, the initial agreement containing a broad definition of arbitrator qualifications, while subsequent Indemnity Agreements required arbitrators to be "executive officials of fire or casualty insurance or reinsurance companies." *Compare* Exh. 12, 1983-84 Indemnity Agreement at Art. VIII, p. 10 *with, e.g.*, Exh. 17 at Art. IX, p. 9.

**Each Indemnity Agreement Requires Arbitration Solely as to Interpretational Disputes**

40.     The arbitration clauses across the Pre-1989 Indemnity Agreements all contained a narrow definition of the matters committed to arbitration. Specifically, the parties agreed to arbitrate only "disputes or differences arising out of the interpretation of this Agreement." Other than "interpretational" disputes, no other disputes were directed to arbitration.

**National Union Alleges The Existence of a Putative 1989-90 Indemnity Agreement**

41.     National Union has asserted that the 1989-90 region-based insurance program (which differed substantially from the prior nationwide programs) included an Indemnity Agreement, but it has never been able to locate or produce such an agreement.

42.     After receiving numerous requests from J.R. Clarkson and Crosby Valve over the last eight years, National Union finally admitted on September 12, 2023 that it does not have and has never been able to locate the Putative 1989-90 Indemnity Agreement. *See* Exh. 29, Sept. 12, 2023 Ltr.

43. Because it cannot produce any Indemnity Agreement for the 1989-90 program year, National Union is simply speculating that the 1989-90 program year, rather than providing "pure insurance" (as in 1982-83), instead provided insurance subject to some sort of partial fronting arrangement (as in the periods between 1983-84 and 1988-89).

44. Further, even if National Union's speculation is correct that some sort of partial fronting arrangement was in place during the 1989-90 program year, National Union has never come forward with any documentation of what the terms and conditions of that fronting arrangement would have been. For example, there is no way to know the various "per occurrence" limits of the putative fronting arrangement; or whether those per-occurrence limits included Allocated Loss Expense; or whether the fronting arrangement was subject to an overall aggregate limit; or whether the putative agreement included an arbitration clause, or whether the terms of such an arbitration clause included the language from 1983-84 or from other years.

45. In a recent court filing, National Union posited that the putative 1989-90 agreement must have followed the wording of the preceding 1988-89 Indemnity Agreement, at least to the extent that it must have included an arbitration clause and that it was the same clause as that found in the 1988-89 Indemnity Agreement. But in making such an assertion, National Union elided the many year-to-year changes in the Indemnity Agreement over the preceding six periods, including differences in the composition of the arbitration clause in those earlier years, as well as arbitration clauses historically employed by National Union in other agreements.

46. None of the arbitration clauses in the prior-years' Indemnity Agreements contains any language that would strip this court of the authority to hear and decide questions of arbitrability. National Union has never suggested otherwise.

47.   Further, National Union can only speculate as to what the other terms and conditions of this alleged 1989-90 agreement would be.

**National Union Advances $2 Million Under One of The Three 1989-90 CGL Policies**

48.   On February 22, 2022, the Massachusetts Superior Court issued a ruling in the Coverage Action that National Union's 1989-90 CGL Policies contained non-cumulation clauses. *See* Exh. 20, Feb. 22, 2022 Memorandum and Order Allowing Plaintiffs' Motion For Partial Summary Judgement on Allocation Issues.  These non-cumulation clauses had the effect of telescoping insurance coverage for continuous-harm events (such as harmful exposure to asbestos) into the 1989-90 policy period.

49.   On December 5, 2022, National Union responded to this ruling by advancing a $2 million payment to Crosby Valve.  According to National Union, this payment was made pursuant to the particular 1989-90 Policy covering Texas risks ("Texas Policy").  National Union has also taken the position that this position has totally exhausted the $2 million limit of liability for product liability claims under the Texas Policy and thereby (according to Liberty Mutual) fully satisfied National Union's duty to indemnify Crosby Valve for asbestos-related settlements and judgments.

50.   However, National Union attached myriad conditions to its "payment," including an assertion that National Union would have the right to recoup the payment if it prevails on appeal in the Coverage Action.  Crosby Valve has consistently disputed the validity of the conditions placed by National Union on this "payment."  Nevertheless, because National Union has asserted a right of recoupment (among other conditions), Crosby Valve has never been able to treat the payment as anything other than a conditional advance, and the funds "paid" by National Union remain in a trust account being held by Crosby Valve's outside counsel.

**National Union Demands That J.R. Clarkson Reimburse The $2 Million Advance**

51.     Six months after tendering the conditional $2 million "indemnity payment" under the Texas Policy, National Union sent a letter demanding that J.R. Clarkson reimburse this payment. *See* Exh. 25, June 6, 2023 Ltr.

52.     J.R. Clarkson asked National Union to provide a copy of the alleged 1989-90 Indemnity Agreement. National Union initially responded that it would "respond soon." But it never did respond; *see* Exh. 26, June 22, 2023 Email Chain, and, as noted *supra*, it has now admitted that it does not have the alleged 1989-Indemnity Agreement. *See* Exh. 29, Sept. 12, 2023 Ltr.

## RESPONDENT'S ARBITRATION DEMAND

53.     On August 25, 2023, National Union served an Arbitration Demand on J.R. Clarkson, demanding that J.R. Clarkson appoint an arbitrator and submit to arbitration within one month (*i.e.*, by September 25, 2023). *See* Exh. 27.

54.     The Arbitration Demand demands arbitration of two categories of disputes. The first, which is premised on the Putative 1989-90 Indemnity Agreement, is described by National Union as follows:

> National Union will seek an award from the Panel (i) declaring that National Union's 1989-1990 Indemnity Claim is covered under the terms of the 1989-1990 Indemnity Agreement.

*Id.*

55.     The second category is harder to pin down. National Union also includes in the Arbitration Demand a demand that J.R. Clarkson submit to arbitration with respect to unspecified "disputes" under three Pre-1989 Indemnity Agreements:

> Reference is made to the following indemnity agreements entered into between National Union and Moorco International, Inc. ("Moorco") . . . :

13

> (i) the indemnity agreement effective May 31, 1984 to May 31, 1985 regarding, inter alia, insurance policy no. GLA 960-15-13; (ii) the indemnity agreement effective May 31, 1987 to May 31, 1988 regarding, inter alia, insurance policy no. RMGLA 197-99-78; [and] (iii) the indemnity agreement effective May 31, 1988 to May 31, 1989 regarding, inter alia, insurance policy no. RMGLA 249-64-28. . . .
>
> National Union hereby demands arbitration with respect to . . . (ii) declaratory relief with respect to the Indemnitors' indemnification obligations under the other Indemnity Agreements for any future payments by National Union to Crosby in connection with the Crosby Action.
>
> In this arbitration, National Union will seek an award from the Panel . . . (iii) declaring the Indemnitors' indemnification obligations under the other Indemnity Agreements with respect to any other payments by National Union to Crosby in connection with the Crosby Action.

*Id.*

56. Before or after issuing the Arbitration Demand, National Union never paid out for Crosby Valve claims under Pre-1989 CGL Policies or identified any related disputes under the Pre-1989 Indemnity Agreements. The Arbitration Demand does not state what those disputes are.

### J.R. CLARKSON DID NOT AGREE TO ARBITRATE THE EXISTENCE OR ENFORCEABILITY OF THE ALLEGED 1989-90 INDEMNITY AGREEMENT

57. J.R. Clarkson is entitled to a declaration that National Union cannot force it to arbitrate putative disputes arising out of a purported 1989-90 Indemnity Agreement.

58. J.R. Clarkson is informed and believes that National Union will rely on secondary evidence to establish the existence of the Putative 1989-90 Indemnity Agreement. Whether or not National Union can establish such an agreement, there is ***no*** secondary evidence of an agreement to arbitrate disputes related to that putative agreement. National Union therefore cannot satisfy the threshold requirement of proving the existence of a written agreement to arbitrate.

59. Further, even under National Union's theory that the Putative 1989-90 Indemnity Agreement must have had the same arbitration clause as that found in several of the Pre-1989 Indemnity Agreements (an assertion that J.R. Clarkson rejects), that clause limits arbitration solely

to "interpretation" of the Indemnity Agreement. None of the arbitration clauses in the Pre-1989 Indemnity Agreements extends to disputes over "application" or "enforcement" of the particular Indemnity Agreement.

60. The gravamen of National Union's first arbitration demand – to force J.R. Clarkson to reimburse the $2 million advance that National Union made to Crosby Valve – is a pure attempt to apply and enforce the Indemnity Agreement, not to interpret it. Such disputes are not committed to arbitration, and therefore National Union cannot establish that it has raised an arbitrable dispute.

### NATIONAL UNION HAS NOT ALLEGED AN ARBITRABLE DISPUTE ARISING FROM PRIOR YEARS' INDEMNITY AGREEMENTS

61. Additionally, there is no arbitrable issue under the pre-1989 Indemnity Agreements because the disputes National Union alleges (to the extent one can divine any dispute from its broad statement) do not fall within the narrow bounds of the arbitration clause found within those agreements.

62. The arbitration clause in the Pre-1989 Indemnity Agreements—which applies only to disputes "arising out of the interpretation" of the Agreement"—does not apply to the unspecified "disputes" alleged by National Union.

63. Further, to the extent National Union seeks a declaration that the Pre-1989 Indemnity Agreements will require J.R. Clarkson to indemnify future payments that have not yet been made, such disputes are non-justiciable; and even if they were, they are disputes over "application" and "enforcement" of the Pre-1989 Indemnity Agreements, not "interpretation." Therefore, they are not committed to arbitration.

### THE COURT SHOULD ENJOIN RESPONDENT FROM PURSUING ARBITRATION AGAINST PETITIONER

64. Petitioner realleges the allegations set forth above as if fully set forth herein.

65.     Arbitration is a matter of contract. A party cannot be required to submit to arbitration any dispute that it has not agreed in writing to submit to arbitration.

66.     Respondent has not produced evidence sufficient to prove that the Putative 1989-90 Indemnity Agreement exists or ever existed, let alone evidence sufficient to establish that such putative contract contained a written agreement to arbitrate.

67.     Further, even if such an agreement to arbitrate exists (which J.R. Clarkson denies), National Union has taken the position that it would apply solely to disputes involving the "interpretation" of the putative Indemnity Agreement. However, the dispute that National Union seeks to arbitrate involves the application and enforcement of the Putative 1989-90 Indemnity Agreement. National Union has no evidence that Petitioner ever agreed to arbitrate disputes over the application or enforcement of an Indemnity Agreement.

68.     National Union is seeking arbitration of unspecified and non-justiciable "disputes" regarding the possible application of Pre-1989 Indemnity Agreements that may or may not be applicable to future payments that National Union may or may not make to Crosby Valve. But National Union has made this demand under arbitration clauses that apply solely to the "interpretation" of the Pre-1989 Indemnity Agreements, not to their application or enforcement. Therefore, National Union is seeking arbitration of "disputes" that Petitioner never agreed to arbitrate.

69.     Petitioner has a Seventh Amendment right to litigate in court any disputes that it has not agreed to arbitrate.

70.     Petitioner will be irreparably harmed if Respondent is permitted to pursue the New York arbitration against it, because such arbitration will preclude J.R. Clarkson from exercising its constitutional trial rights.

71. Petitioner is likely to succeed on the merits of its claims as (1) no written agreement to arbitrate exists under the Putative 1989-90 Indemnity Agreement; (2) the disputes that Respondent alleges are subject to arbitration do not fall within the narrow arbitration clause found in the Pre-1989 Indemnity Agreements and that (according to National Union) would define the scope of arbitration under the Putative 1989-90 Indemnity Agreement.

72. Petitioner has no adequate remedy at law and is therefore entitled to injunctive relief barring Respondent from pursuing the New York arbitration against it.

73. Further, the Court should declare that the Putative 1989-90 Indemnity Agreement does not exist or, if it does exist, that its terms and conditions cannot be established.

**WHEREFORE**, Petitioner respectfully requests that this Court:

**A.** Issue an Order preliminarily and then permanently enjoining the New York Arbitration invoked by Respondent;

**B.** Enter Declaratory Judgment in favor of Petitioner holding that the Putative 1989-90 Indemnity Agreement does not exist or, if it does exist, that its terms and conditions cannot be established;

**C.** Enter Declaratory Judgment in favor of Petitioner holding that there is no agreement to arbitrate as between Petitioner and Respondent with respect to the 1989-90 CGL Policies; and

**D.** Grant Petitioner such other relief as may be just and proper in the circumstances.

Dated: November 21, 2023
     New York, NY

By:  /s/ *Paul T. Moura*

LATHAM & WATKINS LLP

Paul T. Moura
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
paul.moura@lw.com

Robert J. Gilbert (*pro hac vice* forthcoming)
Nathan A. Sandals (*pro hac vice* forthcoming)
Caitlin E. Feeney
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
robert.gilbert@lw.com
nathan.sandals@lw.com
caitlin.feeney@lw.com

*Attorneys for Petitioner The J.R. Clarkson Company LLC*