UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

THE J.R. CLARKSON COMPANY LLC,

               Petitioner,

– against –

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

               Respondent.

------------------------------------------------------------

23 Civ. 10252

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE TO PRELIMINARILY AND <u>PERMANENTLY ENJOIN ARBITRATION</u>

**LATHAM & WATKINS LLP**

Robert J. Gilbert*
Nathan A. Sandals*
Caitlin E. Feeney
200 Clarendon Street
Boston, MA 02116

Paul T. Moura
1271 Avenue of the Americas
New York, NY 10020

*Attorneys for the Petitioner, The J.R.
Clarkson Company LLC*

\* *Pro hac vice* forthcoming

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Amer. Exp. Financial. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011)...............................................................................12

*AT&T Tech., Inc. v. Comms. Workers of Am.*,
    475 U.S. 643 (1986)..................................................................................17, 19

*China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*,
    803 F. App'x 481 (2d Cir. 2020) ...............................................................19

*Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*,
    349 F. App'x 551 (2d Cir. 2009) .....................................................14, 15, 16

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*,
    130 S. Ct. 2847 (2010)...............................................................................12, 13

*Holick v. Cellular Sales of New York, LLC*,
    802 F.3d 391 (2d Cir. 2015)........................................................................19, 20

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002)........................................................................................12

*Interactive Brokers, LLC v. Duran*,
    No. 08-CV-6813, 2009 WL 393827 (N.D. Ill. Feb. 17, 2009) ................................21

*Iota Shipholding Ltd. v. Starr Indem. & Liab. Co.*,
    No. 16 CIV. 4881 (KPF), 2017 WL 2374359 (S.D.N.Y. May 31, 2017)..............................13

*Mayfield v. Asta Funding, Inc.*,
    95 F. Supp. 3d 685 (S.D.N.Y. 2015).....................................................................13

*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*,
    858 F.2d 825 (2d Cir. 1988)..............................................................................17

*Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003)........................................................................12, 19

*Opals on Ice Lingerie v. Bodylines Inc.*,
    320 F.3d 362 (2d Cir. 2003)..............................................................................13

*Prudential Lines, Inc. v. Exxon Corp.*,
    704 F.2d 59 (2d Cir. 1983)..............................................................................17

i

*Ross v. Am. Express Co.*,
    478 F.3d 96 (2d Cir. 2007)........................................................................................14

*Rothstein v. Fung*,
    No. 03 Civ. 0674MGC, 2004 WL 1151568 (S.D.N.Y. May 24, 2004)...........................14, 15

*Scone Investments, L.P. v. Amer. Third Market Corp.*,
    992 F. Supp. 378 (S.D.N.Y. 1998)...........................................................................14

*Tellium, Inc. v. Corning, Inc.*,
    No. 03-CV-8487 (NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004)................................19

*TicketNetwork, Inc. v. Darbouze*,
    133 F. Supp 3d 442 (D. Conn. 2015).........................................................................12

*UBS Sec. LLC v. Voegeli*,
    684 F. Supp. 2d 351 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011).....................19

*Washington Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union*,
    113 F. Supp. 3d 121 (D.D.C. 2015) .........................................................................20

**Statutes**

Fed. R. Civ. P. 65(a), (b).............................................................................................12

Federal Arbitration Act, 9 U.S.C. §§ 3 and 4 ....................................................................2

Federal Arbitration Act, 28 U.S.C §§ 2201 and 2022 ..........................................................2

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

    A.    The Insurance Program Issued by National Union to Geosource and Moorco ........................................................................................................4

    B.    The Differences in the Pre-1989 Indemnity Agreements .........................................7

    C.    The Underlying Claims and the Insurance Coverage Action in Massachusetts Superior Court...............................................................................8

    D.    National Union's Conditional Response to the Massachusetts Court's Finding that the 1989-90 Policies Contain a Non-Cumulation Clause....................9

    E.    National Union Demands Two Categories of Arbitration .....................................10

    F.    The Massachusetts Superior Court Determined It Lacked Jurisdiction Over National Union With Respect To These Disputes ..................................................11

ARGUMENT ......................................................................................................................12

    A.    J.R. Clarkson is Likely to Succeed on the Merits ................................................13

    B.    Without Injunctive Relief, J.R. Clarkson Will Suffer Irreparable Harm ..............19

CONCLUSION....................................................................................................................21

## PRELIMINARY STATEMENT

J.R. Clarkson seeks to enjoin an attempt by National Union to arbitrate "disputes" that have never been committed to arbitration.  Specifically, on August 25, 2023, National Union improperly demanded arbitration of two categories of disputes.

- The first category involves a payment dispute under an alleged 1989-90 Indemnity Agreement that has never been produced and (if it ever even existed) cannot be shown to contain an arbitration clause, let alone one that would encompass the payment dispute.

- The second category involves unspecified "disputes" that allegedly arise under Pre-1989 Indemnity Agreements.  These pre-1989 contracts do contain arbitration clauses, albeit narrow ones that apply solely to disputes over "interpretation" of the relevant contract(s).  Because National Union has never identified the actual "disputes" at issue, it cannot establish that they are contract-interpretation disputes of the type that have been committed to arbitration.

To protect its core Seventh Amendment rights, J.R. Clarkson is entitled to immediate injunctive relief to enjoin National Union from compelling arbitration of disputes that J.R. Clarkson never agreed to arbitrate.[1]  Both parties have appointed arbitrators (J.R. Clarkson has done so under protest) despite no evidence establishing the agreed arbitrator qualifications, and those arbitrators are now in the process of selecting an umpire.  Without intervention, J.R. Clarkson will be forced to submit to unauthorized arbitral proceedings involving claims that it never agreed to arbitrate.  Rule 65 allows and requires "expedited" consideration of J.R. Clarkson's motion.

---

[1] While Petitioner seeks expedited relief to resolve the issues detailed in this briefing, it does not seek relief over the Thanksgiving holiday weekend, nor does it intend to intrude on the Court's or opposing counsel's holiday.

**Relief Sought:** This motion seeks the following:

- An Order under Rule 65 enjoining National Union from proceeding on either category of arbitration set out in its August 25, 2023 Arbitration Demand; and

- A Declaratory Judgment, pursuant to 28 U.S.C §§ 2201 and 2022, Rule 57, and the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, in favor of J.R. Clarkson that it did not agree to arbitrate National Union's putative disputes.

**First, J.R. Clarkson Never Agreed to Arbitrate Disputes Relating to the Putative 1989-90 Indemnity Agreement.**  Under bedrock arbitration law, including the Federal Arbitration Act, a party may not be compelled to arbitrate issues that it did not commit in writing to arbitrate. National Union faces four hurdles:

- First, National Union has demanded arbitration under a Putative 1989-90 Indemnity Agreement that J.R. Clarkson does not possess, that National Union has never produced, and that National Union now admits it cannot locate.  On this basis alone, it loses.

- Second, National Union relies on secondary evidence in an effort to prove that some sort of indemnity agreement likely existed for the 1989-90 period.  However, none of National Union's secondary evidence contains any suggestion that the putative agreement, if it existed at all, also contained an agreement to arbitrate.

- Third, even if one assumed that a written Indemnity Agreement existed and that it must have included some sort of arbitration clause, National Union cannot establish the terms of such a clause.  Lacking actual evidence of its terms, National Union simply speculates that such a clause "must have" incorporated the wording found in the arbitration clauses found in some (but not all) of the prior iterations of the Indemnity Agreement.  This argument overlooks the vast number of year-to-year changes in the prior Indemnity Agreements, whether involving arbitration clauses

or other provisions.  Because the Indemnity Agreements varied annually, there is no support for National Union's speculation that the Putative 1989-90 Agreement would have followed prior-year provisions that National Union now finds convenient.

- Finally, even if National Union could surmount all of the evidentiary hurdles, it would still have no basis to compel arbitration of the current payment dispute.  This is because the arbitration clause in that prior-year agreement applies only to "disputes or differences *arising out of the interpretation of this Agreement*."  But the dispute that National Union seeks to arbitrate concerns J.R. Clarkson's refusal to reimburse $2 million that National Union had earlier advanced to one of J.R. Clarkson's corporate affiliates.  This is not a dispute over "interpretation" of the Putative 1989-90 Indemnity Agreement, but instead is a dispute over "application" or "enforcement" of that alleged contract.

**Second, No Arbitrable Disputes Exist With Respect To The Pre-1989 Indemnity Agreements.**  Under well-established FAA principles, a party cannot be compelled to arbitrate a dispute outside the scope of the agreed-upon arbitration clause.  National Union fails to identify a single issue, factual or legal, that J.R. Clarkson agreed to arbitrate.

The problem is that National Union has refused to specify the disputes that it alleges to exist under these Pre-1989 Indemnity Agreements.  Those agreements mandate arbitration of only a narrow category of disputes involving "the interpretation of [the] Agreement."  Exh. 17, 1988-89 Indemnity Agreement at 9.  By refusing to identify the actual disputes, National Union has failed to establish that  they involve "the interpretation of [the] Agreement[s]."

**J.R. Clarkson Meets the Standard for Injunctive Relief.** Given the overwhelming factual, statutory and decisional authority supporting its position, J.R. Clarkson readily demonstrates its likelihood of demonstrating National Union's inability to prove any agreement by J.R. Clarkson to arbitrate any of the "disputes" asserted in National Union's August 25, 2023 Arbitration Demand. Further, a stay of arbitration pending resolution of this lawsuit is justified by long-standing case law affirming that improper compulsion to arbitrate constitutes *per se* irreparable harm. Compared to the negligible harm that National Union would endure from a stay, the balance of hardships tips heavily in J.R. Clarkson's favor.

## STATEMENT OF FACTS

### A.    The Insurance Program Issued by National Union to Geosource and Moorco[2]

Over an eight-year period between 1982-83 and 1989-90, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued a broad program of third-party liability insurance coverage to Geosource, Inc. and then to Moorco International, Inc. (now known as The J.R. Clarkson Company LLC ("J.R. Clarkson")),[3] under which National Union agreed to defend and indemnify J.R. Clarkson, and its subsidiaries. This program of insurance included automobile liability insurance, workers' compensation insurance and commercial general liability ("CGL") insurance. The CGL Policies in this program obligated National Union to defend and indemnify

---

[2] As explained in the accompanying Petition at ¶¶ 14–22, the relevant corporate history of this matter involves three entities: (a) Geosource, Inc. ("Geosource"), (b) Moorco, and (c) the Petitioner, J.R. Clarkson. In 1981, Geosource acquired an entity now known as Crosby Valve, LLC ("Crosby Valve"), and in 1984, Moorco acquired Crosby Valve from Geosource.

[3] In 2001, Moorco merged with and into CV Holding, Inc. In 2009, CV Holding, Inc. merged with and into J.R. Clarkson.

Moorco and its subsidiaries, including Crosby Valve & Gage Co. (now, Crosby Valve, LLC and referred to herein as "Crosby Valve") and other entities against third-party liability claims.

### 1.    Material Variations in National Union's Insurance Program

*Limits and Costs of Coverage:* Over its eight-year course, National Union's insurance program evolved and varied in numerous ways.  The limits of liability for products liability, for example, fluctuated from one year to the next, with per occurrence and aggregate limits of $1,000,000 for the years 1982-83 to 1986-87; $3 million per occurrence and aggregate in 1987-88 and 1988-89, and $2 million in 1989-90.  *See* Exhs. 1–8, CGL Policies.  Similarly, premiums for the cost of coverage fluctuated substantially from year to year.  The premium for CGL coverage (including products liability) ranged from a high of $666,289 in 1984-85 to a low of $156,378 in 1986-87.  *See* Exh. 3, 1984-85 CGL Policy at 2; Exh. 5, 1986-87 CGL Policy at 1.

*Exclusions***:** The exclusions found in the different policies varied from policy to policy. For example, early policies contained limited pollution exclusions with exceptions for sudden and accidental releases; later policies contained somewhat broader pollution exclusions with different exceptions, such as releases caused by hostile fires.

*Policy Conditions:* The exact form of the policies and their various endorsements also changed over the years.  While the 1984-85 policy does not contain an additional condition concerning arbitration, for example, the 1986-87 policy does contain a condition that allows the insurer to exercise all of the insured's rights in the choice of arbitrators and the conduct of an arbitration proceeding.

*Definition of "Insured"***:** From year to year, the policies not only contained different lists of "Named Insureds" but also used different definitions of persons or entities who would qualify as named insureds, additional insureds or other insureds even if not expressly identified.  *See* Exh. 6, 1987-88 CGL Policy, at 4–5; Exh. 7, 1988-89 CGL Policy at 10-11.

***The Switch from Nationwide to Regional CGL Policies:*** The program of insurance issued by National Union to J.R. Clarkson looked much different in the first seven years than in the final year. For each of the policy periods beginning in 1982-83 and ending in 1988-89, National Union issued a single CGL Policy applicable to, *inter alia*, risks arising in all 50 states. Instead of a single policy for all 50 states, in the 1989-90 policy year, National Union issued three separate CGL Policies, each with its own premium and each providing $2 million per occurrence and in the aggregate, covering three different geographies within the United States. One policy applied to Texas; a second was issued for Massachusetts and New Jersey; the third applied to all other states. *See* Exhs. 9–11 (Excerpts of 1989-90 CGL Policies).

***Inclusion of a "Non-Cumulation Clause" in the 1989-90 Policies:*** Unlike the policies in the prior seven periods, the 1989-90 CGL Policies contain so-called non-cumulation clauses. The practical effect of a non-cumulation clause is that, to the extent a covered claim is also covered under one or National Union CGL Policies issued for different time periods, the policy/ies with the non-cumulation clause must respond first, until those limits are exhausted.

***Pure Insurance Versus Partial "Fronting":*** In the first coverage period in 1982-83, National Union provided pure insurance coverage. Over the next six periods, the CGL Policies were partial "fronting policies." That is, the CGL Policies provided full coverage to third parties, with J.R. Clarkson agreeing to repay some of the amounts incurred by National Union for defense and/or indemnity payments made per the underlying insurance policies. This partial fronting arrangement was effectuated by a series of "Indemnity Agreements" between National Union and J.R. Clarkson's predecessor, Moorco. Although the Indemnity Agreements drafted by National Union always bore the same title, the actual terms and conditions varied from year to year. *See* Exhs. 12–17 (Pre-1989 Indemnity Agreements). The Pre-1989 Indemnity Agreements contain a

"narrow" arbitration clause, in which the parties agreed to arbitrate "all disputes or differences *arising out of the interpretation of this Agreement*." *See, e.g.*, Exh. 17, 1988-89 Indemnity Agreement at 9 (emphasis added)).

*No Indemnity Agreement:* While National Union alleges that it issued some form of Indemnity Agreement with the three newly region-based 1989-90 CGL Policies, that putative Indemnity Agreement has never been produced, and nobody knows its terms. After three requests across eight years, National Union now admits that it cannot locate the putative 1989-90 Indemnity Agreement. Plaintiffs first requested any such agreement in related litigation described more fully below (*infra* at 1.C.). National Union did not provide it. Plaintiffs next requested a copy on June 21, 2023 and National Union's counsel stated the next day that it was "looking into [Plaintiffs'] request and [would] respond soon." *See* Exh. 26, June 21, 2023 Email Chain. Finally, after National Union sent J.R. Clarkson the August 25, 2023 Arbitration Demand, J.R. Clarkson requested the agreement for a third time. *See* Exh. 28, Sept. 5, 2023 Ltr. For the first time on September 12, 2023, National Union's counsel admitted that "National Union has been unable to locate a copy of the 1989-1990 indemnity agreement." *See* Exh. 29, Sept. 12, 2023 Ltr.

B.      **The Differences in the Pre-1989 Indemnity Agreements**

Although the Pre-1989 Indemnity Agreements are similar, they are not identical, and the precise language and purpose of the Indemnity Agreements changed materially over time.

The arbitration clauses in the various Pre-1989 Indemnity Agreements also varied. For example, the initial agreement containing a broad definition of arbitrator qualifications, while subsequent Indemnity Agreements required arbitrators to be "executive officials of fire or casualty insurance or reinsurance companies."

The arbitration clauses across the Pre-1989 Indemnity Agreements all contained a narrow definition of the matters committed to arbitration. Specifically, the parties agreed to arbitrate only

"disputes or differences arising out of the interpretation of this Agreement."   Other than "interpretational" disputes, no other disputes were directed to arbitration.

The terms and conditions of the Pre-1989 indemnity agreements also varied. The 1987-88 agreement added new introductory language, the result of which is the Self-insured Retention ("SIR") under the agreement is $250,000 (as opposed to $150,000 in the 1986-1987 agreement) and where no loss is paid but there are allocated expenses incurred, Moorco will assume allocated loss expenses up to the SIR. *See* Exh. 16, 1987-88 Indemnity Agreement at 6–7.  The 1987-88 Indemnity Agreement also changed the introductory language to exclude indemnity for liability incurred from National Union's negligent acts.  *See* Exh. 13, 1984-85 Indemnity Agreement at 4; Exh. 16 at 6.  In addition to the changes in the indemnity language, the 1984-85, 1987-88, and 1988-89 agreements all contain different language laying out the exact purpose of the agreements. *See* Exh. 13 at 1–2; Exh. 16 at 1; Exh. 17 at 1.  The 1984-85 Agreement contains addenda that do not appear to exist in later agreements.   *See* Exh. 13 at 15–25.  The 1984-85 and 1987-88 Agreements contain completely different fee and premium structures; the 1987-88 and 1988-89 Agreements use the same structure but the fee and premium amounts changed over time.  *See* Exh. 13 at 2–3; Exh. 16 at 4–5; Exh. 17 at 4–5.

### C.    The Underlying Claims and the Insurance Coverage Action in Massachusetts Superior Court

Over the past two decades, J.R. Clarkson's affiliate, Crosby Valve, has been sued thousands of times for personal injury claims alleging injurious exposure to asbestos allegedly contained in its valve products.  Crosby Valve is currently defending hundreds of pending cases and anticipates many future lawsuits (the "Underlying Claims").   In connection with the Underlying Claims, Crosby Valve has sought defense and indemnity from its historical CGL insurers, including National Union.

Since 2012, Crosby Valve and National Union (along with many other parties) have been involved in a Massachusetts state court lawsuit concerning insurance coverage for the Underlying Claims (the "Coverage Action").  *See* Exh. 18, Coverage Action Complaint; *see also* Exh. 24, MA Docket at File Ref. Nbr. 1.  In that action, Crosby Valve alleges, *inter alia*, that National Union breached its duties to defend and indemnify Crosby Valve under the CGL Policies.

In a pair of summary judgment rulings in 2022, the Massachusetts Superior Court concluded that, under Massachusetts law, National Union's 1989-1990 CGL Policies are subject to allocation on an "all sums" or "joint and several" basis (rather than a "pro rata" basis) with respect to coverage for Crosby Valve's asbestos-related defense and indemnity costs.  *See* Exh. 20, Feb. 22, 2022 Memorandum and Order Allowing Plaintiffs' Motion For Partial Summary Judgement on Allocation Issues; *see also* Exh. 19, Jan. 11, 2021 Order Denying Reconsideration. As part of its ruling, the Massachusetts Court found that the National Union's 1989-90 CGL Policies contain so-called "non-cumulation clauses."

### D.    National Union's Conditional Response to the Massachusetts Court's Finding that the 1989-90 Policies Contain a Non-Cumulation Clause

***National Union makes a $2 million advance under one of the 1989-90 Policies:*** On December 5, 2022, in response to the Massachusetts Superior Court's ruling that its 1989-90 Policies contained non-cumulation clauses, National Union advanced $2 million in purported reimbursement for past indemnity costs to Crosby Valve under the 1989-90 CGL Policy covering Texas risks.   Although National Union called this a "payment," it actually constituted a "conditional advance," due to the numerous conditions that National Union attached to the payment, including an asserted contractual right to recoup the payment if it prevails on appeal. *See* Decl. of D. Westrup at ¶ 8.  Put differently, J.R. Clarkson disputes that National Union has "paid" $2 million in coverage under the 1989-90 Policies.

Six months after tendering the conditional $2 million "indemnity payment" under one of the 1989-90 CGL Policies, National Union sent a letter dated June 6, 2023, demanding that Crosby Valve's parent, J.R. Clarkson (as the successor to Moorco), reimburse this payment. *See* Exh. 25, June 6, 2023 Ltr. National Union based this demand on an alleged 1989-90 Indemnity Agreement.[4] *See id.* Although the letter acknowledged the issuance of all three 1989-90 CGL Policies, National Union sought reimbursement solely with respect to the Texas Policy (No. 459-67-66). *See id.* An invoice for $2 million was attached. *See id.*

J.R. Clarkson responded by asking National Union to provide the alleged Indemnity Agreement (*see* Exh. 26), but National Union failed to do so.

### E.    National Union Demands Two Categories of Arbitration

Instead, on August 25, 2023, National Union sent an Arbitration Demand (Exh. 27) in which it sought two categories of arbitration:

First, National Union demanded arbitration under the Putative 1989-90 Indemnity Agreement with respect to its claim that J.R. Clarkson had breached its obligation to indemnify National Union for the $2 million conditional advance to Crosby Valve. Second, National Union demanded arbitration with respect to unspecified "disputes" under three Pre-1989 Indemnity Agreements. Specifically, National Union stated:

> Reference is made to the following indemnity agreements entered into between National Union and Moorco International, Inc. ("Moorco") . . . : (i) the indemnity agreement effective May 31, 1984 to May 31, 1985 regarding, inter alia, insurance policy no. GLA 960-15-13; (ii) the indemnity agreement effective May 31, 1987 to May 31, 1988 regarding, inter alia, insurance policy no. RMGLA 197-99-78; [and] (iii) the indemnity

---

[4] The June 6, 2023 Demand for Payment referred only to the advance made by National Union under the 1989-90 CGL Texas Policy, but did not refer to or make any demands under any Pre-1989 CGL Policies or Indemnity Agreements. *See* Exh. 25. Accordingly, National Union has never requested any reimbursement of the "indemnity payment" or any other Crosby Valve Asbestos Claim payments pursuant to any Pre-1989 Indemnity Agreements.

> agreement effective May 31, 1988 to May 31, 1989 regarding, inter alia, insurance policy no. RMGLA 249-64-28. . . .
>
> National Union hereby demands arbitration with respect to . . . (ii) declaratory relief with respect to the Indemnitors' indemnification obligations under the other Indemnity Agreements for any future payments by National Union to Crosby in connection with the Crosby Action.
>
> In this arbitration, National Union will seek an award from the Panel . . . (iii) declaring the Indemnitors' indemnification obligations under the other Indemnity Agreements with respect to any other payments by National Union to Crosby in connection with the Crosby Action.

*See id.* at 1–2.  This second category of demand was puzzling, as (a) National Union had never paid any amounts for the Underlying Claims under Pre-1989 CGL Policies, and (b) National Union had never identified any disputes with J.R. Clarkson regarding the Pre-1989 Indemnity Agreements.  More puzzling, the Arbitration Demand did not identify any actual disputes; and in response to J.R. Clarkson's inquiry, National Union refused to identify what disputes it was alleging to exist.  *See* Exh. 28; *see also* Exh. 29.

### F.    The Massachusetts Superior Court Determined It Lacked Jurisdiction Over National Union With Respect To These Disputes

Before coming to this Court, J.R. Clarkson sought relief in the pending Massachusetts Action.  In its opposition to Crosby Valve's request for emergency relief, National Union challenged the Massachusetts court's jurisdiction over National Union with respect to its August 25, 2023 Arbitration Demand.  The Massachusetts Superior Court accepted this argument and declined to issue temporary relief to J.R. Clarkson.  *See* Exh. 22, Sept. 23, 2023 MA Order.  Accordingly, J.R. Clarkson appointed an arbitrator under the terms of the Pre-1989 Indemnity Agreements, doing so under protest.

J.R. Clarkson now seeks expedited relief from this Court, which unquestionably has personal jurisdiction and subject matter jurisdiction to resolve the issues of arbitrability and contract existence presented by this Petition.

## ARGUMENT

In this motion, J.R. Clarkson seeks straightforward injunctive relief to prevent irreparable harm to its Seventh Amendment rights while the Court adjudicates its claims for declaratory relief. This Court has the power to decide whether J.R. Clarkson agreed to arbitrate the putative disputes National Union raised.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted).  It is "well settled" that arbitrability is "typically an issue for judicial determination."  *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 130 S. Ct. 2847, 2855–56 (2010). And, pursuant to Rule 65, this Court has authority to issue temporary restraining orders and preliminary injunctions to preserve the status quo during the pendency of a dispute over arbitrability.  *See* Fed. R. Civ. P. 65(a), (b); *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011) (noting that the Second Circuit has held that district courts have "the authority to order the cessation of an arbitration by parties within its jurisdiction where such authority appears necessary in order for a court to enforce the terms of the parties' own agreement") (citing *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 141).

A moving party is entitled to a preliminary injunction staying an arbitration where it can demonstrate "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor."  *Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)  (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348–49 (2d Cir. 2003)).

Where, as here, there is no agreement to arbitrate, courts in the Second Circuit have found that the traditional factors considered in granting injunctive relief are deemed satisfied for purposes of enjoining an arbitration.  *See, e.g., TicketNetwork, Inc. v. Darbouze*, 133 F. Supp 3d 442, 454

(D. Conn. 2015); *Iota Shipholding Ltd. v. Starr Indem. & Liab. Co.*, No. 16 CIV. 4881 (KPF), 2017 WL 2374359, at *4 (S.D.N.Y. May 31, 2017).

### A.    J.R. Clarkson is Likely to Succeed on the Merits

J.R. Clarkson's likelihood of success is established by the absence of an agreement to arbitrate coupled with overwhelming statutory and case law support.  "[A] court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.'"  *Granite Rock Co.*, 561 U.S. at 302–03. (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (ellipses in *Granite Rock*)).  The entity seeking arbitration (here, National Union) "bears the burden of establishing that a binding agreement to arbitrate was formed."  *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 693 (S.D.N.Y. 2015) (denying motion to compel arbitration under the FAA).  Thus, to prevail against J.R. Clarkson's claim for a declaratory judgment, National Union must "make a prima facie initial showing that an agreement to arbitrate existed."  *See id.* (quoting *Hines v. Overstock.com Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010)).  National Union cannot make this showing.

At the most basic level, J.R. Clarkson is likely to succeed on the merits of its claim for declaratory relief regarding the 1989-90 dispute because there is no direct evidence that an agreement to arbitrate ever existed.  National Union will produce secondary evidence regarding some sort of indemnity arrangement for the 1989-90 policy year; but it has no evidence (a) that any putative agreement was reduced to writing; (b) what terms were agreed to; (c) whether the indemnity obligations were satisfied or have otherwise expired; (d) whether the alleged agreement included an arbitration clause; or (e) what the scope of such a clause would have been.  The Second Circuit has refused to compel arbitration where far more compelling evidence of an agreement to arbitrate has been provided.  *See, e.g.*, *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 371– 72 (2d Cir. 2003) (denying motion to compel arbitration where both parties signed contracts

agreeing to arbitrate, but never signed the same document containing a list of agreed-upon arbitration terms); *see also Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009) (affirming lower court's denial of motion to compel arbitration where the party seeking arbitration produced a copy of the first and last page of a signed arbitration agreement, but was unable to produce the pages in between, because "even if a contract did exist . . . that agreement is not enforceable because . . . the party seeking enforcement . . . has failed to prove its terms.").

### 1.    National Union Cannot Satisfy the Threshold Requirement of a Written Agreement to Arbitrate

Under the Federal Arbitration Act, arbitration cannot be compelled where, as here, (a) the proponent of arbitration cannot produce the alleged written agreement supposedly containing an arbitration clause, and (b) secondary evidence is inadequate to prove the terms of the agreement or the putative arbitration clause. *See Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007) ("the requirement of a written arbitration agreement is pervasive in the FAA"). In determining the arbitrability of a dispute, "the first question to be addressed is whether the parties had a written agreement to arbitrate." *Scone Investments, L.P. v. Amer. Third Market Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998); *see also Rothstein v. Fung*, No. 03 Civ. 0674MGC, 2004 WL 1151568, at *1 (S.D.N.Y. May 24, 2004) (the party seeking arbitration "bear[s] the burden of proving written agreements obligating [the other party] to arbitrate."). A lack of the required written agreements is fatal to an arbitration demand. *See, e.g.*, *Dreyfuss*, 349 F. App'x at 552 (affirming denial of motion to compel arbitration where defendant produced only the first and last page of an agreement that allegedly contained an arbitration clause).

But even if the Court were to assume from secondary evidence that a 1989-90 Indemnity Agreement had once existed in written form, National Union would still lose due to its inability to do anything more than speculate that that the putative Indemnity Agreement may have contained

an agreement to arbitrate.  "[A] party seeking to enforce a contract must prove not only the existence of the contract, but also its terms." *Dreyfuss,* 349 F. App'x at 555 (2d Cir. 2009). National Union has done neither.  Instead, it conjectures that the Putative 1989-90 Indemnity Agreement likely contained an arbitration clause, since some of the prior Indemnity Agreements contained such clauses.  But the record is undisputed that the terms of the Pre-1989 Indemnity Agreements varied widely from year to year, ***and not all of the arbitration clauses are identical.*** *See infra* fn. 6.[5]  Under *Dreyfuss,* such speculation is insufficient under the FAA to establish a written agreement to arbitrate.

Even if National Union could establish that (a) a Putative 1989-90 Indemnity Agreement existed, (b) it was reduced to writing, and (c) it contained an arbitration clause, it can do no more than speculate on what the terms of such a clause are.  This is an even more extreme version of the core problem faced by the proponent of arbitration in *Dreyfuss.*  At least in that case, there was written evidence that both parties had contemplated that their agreement would incorporate some sort of arbitration provision; but because there was no documented meeting of the minds as to the terms of arbitration, the court refused to compel arbitration.

Here, National Union is speculating that if there was a written Indemnity Agreement for 1989-90, it would have incorporated arbitration requirements identical to the most recent Indemnity Agreements, as distinguished from different arbitration requirements from earlier years

---

[5] For instance (and as only a fraction of the differences in annual terms), the 1987-88 Agreement changed the Self-insured Retention ("SIR") to $250,000 (as opposed to $150,000 in the 1986-87 Agreement) and required Moorco to assume allocated loss expenses up to the SIR in certain cases. *See* Exh. 16 at 6–7.  The 1987-88 Indemnity Agreement also changed the introductory language to exclude indemnity for liability incurred as a result of National Union's negligent acts.  *See id.* at 6; *see also* Exh. 13 at 4.  Additionally, many of the Indemnity Agreements contain different language laying out the exact purpose of the agreements.  *See* Exh. 13 at 1–2; Exh. 16 at 1; Exh. 17 at 1.  National Union therefore cannot point to one agreement as instructive.

(1983-84) or requirements otherwise historically used by National Union[6], or no Indemnity Agreement at all (1982-83).  But as seen *supra* at Statement of Facts sections A–B, the Indemnity Agreements contained substantial variations in language from year.

Finally, even if National Union could surmount all of the other hurdles, it is seeking arbitration to **enforce** an Indemnity Agreement, rather than to merely interpret one.  National Union is asking the Court to accept that the Putative 1989-90 Indemnity Agreement would have contained an arbitration clause embodying the same **scope of disputes** that was committed to arbitration in Pre-1989 Indemnity Agreements.  But those arbitration clauses are limited solely to "interpretation" of the Indemnity Agreement (*see infra* at A.2),[7] and thus are plainly too narrow to encompass National Union's stated purpose of *enforcing* the alleged 1989-90 Indemnity Agreement to compel reimbursement of its $2 million advance under the 1989-90 CGL Texas Policy.

For all of these reasons, J.R. Clarkson is entitled to an order enjoining arbitration under the Putative 1989-90 Indemnity Agreement and a declaration that it has not agreed to arbitrate any putative disputes involving the $2 million conditional advance under the 1989-90 CGL Policies.

---

[6] The difference in arbitration clauses between the 1983-84 Indemnity Agreement and the later Indemnity Agreements is material, as the latter require appointment of insurance company insiders ("executive officials of fire or casualty insurance or reinsurance companies"), while the former permitted appointment of a wider range of arbitrators ("executive officials of Fire or Casualty Insurance or Reinsurance Companies, or executive officials of Insurance Agency or Brokerage Companies").  *Compare* Exh. 12, 1983-84 Indemnity Agreement at 10 *with, e.g.*, Exh. 17 at 9. National Union also historically employed other arbitration requirements in its agreements.  *See, e.g., Star Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 15-1403, 4 (6th Cir. 2016) ("'members of the board of arbitration shall be active or retired disinterested officials of the insurance or reinsurance companies . . . not under the control of either party'").  Thus, just as in *Dreyfuss*, even if National Union could get around all of its other difficulties, it still would be unable to establish any agreement on the material terms of an arbitration clause.

[7] As discussed *infra* at A.2, this exact language from the pre-1989 arbitration clauses has been judicially characterized as "narrow."

### 2.    There Is No Arbitrable Dispute Under Pre-1989 Indemnity Agreements

Because National Union has never identified the "disputes" that it proposes to arbitrate under the Pre-1989 Indemnity Agreements, it cannot meet it burden of showing that J.R. Clarkson ever agreed to arbitrate those "disputes."

The "scope of an arbitration clause . . . is a question of the intent of the parties," *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988). The Second Circuit enforces the distinction between (a) "broad" arbitration clauses purporting to apply to all disputes that could potentially arise out of a contract, and (b) "narrow" clauses that restrict arbitration to specific types of disputes. *See id.* (finding a clause to be narrow where it is "not the sort of broad clause in which the parties agree to submit to arbitration disputes of any nature or character, or simply any and all disputes") (internal quotations omitted). The federal presumption in favor of arbitrability applies with more force when the arbitration clause is broad, rather than narrow, such as the clause at issue here. *See AT&T Tech., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 650 (1986). With narrower clauses, "arbitration should not be compelled unless the court determines that the dispute falls within the clause." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983). Courts must consider not only "[s]pecific words or phrases," including words of limitation, but also the "tone of the clause as a whole." *Id.*

The arbitration clause at issue in the Pre-1989 Indemnity Agreements—which applies only to "differences or disputes arising out of the interpretation of this agreement"—is not the type of "broad" clause courts in this Circuit have previously identified. In fact, this Court has judicially construed the exact clause at issue as "narrow." *See Alfa Laval U.S. Treasury Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 857 F. Supp. 2d 404, 409 (S.D.N.Y. 2012) (reviewing an identical arbitration clause in a National Union indemnity agreement and noting that it "lacks the 'very

17

expansive language' typical of broad arbitration agreements," and that "[o]ther courts have found arbitration clauses similar to this one to be narrow."). In *Alfa Laval*, National Union persuaded the court that the disputes at issue could be resolved only by reference to and interpretation of the formulas contained in the indemnity agreements at issue. Here, National Union can make no such showing **because it has literally never identified any disputes under the Pre-1989 Indemnity Agreements**, so it is impossible to determine whether they fall within or outside the scope of the "narrow" arbitration clauses in those agreements.[8] However, based on a straightforward reading of the August 25 Arbitration Demand, there are good reasons to doubt the existence of any disputes that arise out of the "interpretation" of the Indemnity Agreements. For example:

- National Union does not allege that it has ever made any payments with respect to Underlying Claims under any Pre-1989 CGL Policy, or that it expects to make any payments at any foreseeable time;

- National Union does not identify a single amount alleged to be due to it from J.R. Clarkson under any Pre-1989 Indemnity Agreement; and

- National Union does not identify a single "dispute or difference arising from the interpretation of" any of the Indemnity Agreements.

*See* Exh. 27.

At bottom, even if "disputes" exist, National Union cannot show that they have been committed to arbitration under any of the Pre-1989 Indemnity Agreements. "[T]he party seeking arbitration must identify some term or provision requiring interpretation, and there also must be some indication as to how the interpretation of that term or provision will be relevant to the

---

[8] In its September 5, 2023 letter, Petitioner asked for clarification on what perceived "dispute or disagreement" National Union premised its arbitration demand, *see* Exh. 28, and National Union's counsel responded to this request for specification of disputes by literally refusing to engage in a substantive discussion. *See* Exh. 29. Even in its Opposition in Massachusetts state court, National Union failed to explain how its demand related to an alleged 1989-90 Indemnity Agreement—and J.R. Clarkson's challenges to the same—relate to the Pre-1989 Indemnity Agreements and the narrow arbitration clause therein. *See* Exh. 30, NU's Opp. to Mot. to Enjoin at 17.

resolution of the dispute." *Alfa Laval*, 857 F. Supp. 2d at 411.  National Union has failed to do so.

An Order enjoining arbitration under the Pre-1989 Indemnity Agreements, and a declaration that

J.R. Clarkson has not agreed to arbitrate any putative disputes alleged in the Arbitration Demand,

are therefore warranted.

### B.    Without Injunctive Relief, J.R. Clarkson Will Suffer Irreparable Harm

J.R. Clarkson's core rights, including its Seventh Amendment right to a trial by jury, are

threatened if it is forced to arbitrate purported disputes it did not agree to arbitrate.  The FAA's

"liberal policy in favor of arbitration is limited by the principle that 'arbitration is a matter of

consent, not coercion.'"  *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir.

2015).   Because arbitration is a matter of contract, "a party cannot be required to submit to

arbitration any dispute which [it] has not agreed so to submit."  *Id.* (internal quotations omitted).

Where, as here, a party improperly seeks to arbitrate claims not subject to arbitration, it is

appropriate for a federal district court to issue a preliminary injunction staying the arbitration.  *See*

*Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003) (affirming district

court's grant of preliminary injunction staying arbitration); *see also China Shipping Container*

*Lines Co. Ltd. v. Big Port Serv. DMCC*, 803 F. App'x 481, 485 (2d Cir. 2020) ("[f]ederal courts

generally have remedial power to stay arbitration.") (internal quotations omitted).

It is pellucidly clear that a party cannot be forced to arbitrate issues it did not agree to

arbitrate.  *See AT&T Tech., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 650 (1986).  "[T]he

Second Circuit has held that a party necessarily suffers irreparable harm if 'forced to expend time

and resources arbitrating an issue that is not arbitrable.'"  *UBS Sec. LLC v. Voegeli*, 684 F. Supp.

2d 351, 354 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011); *see also Tellium, Inc. v.*

*Corning, Inc.*, No. 03-CV-8487 (NRB), 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004)

("Compelling arbitration of a matter not properly subject to arbitration constitutes *per se* irreparable harm."). But that is exactly what J.R. Clarkson confronts, on two fronts.

First, National Union attempts to invoke arbitration for an alleged contract between the parties that it has not proven up through direct or secondary evidence. National Union expects this Court (or a panel of arbitrators) to first assume the existence of the contract and then to write the terms of that contract, including an arbitration clause that would govern the disputes it perceives as having arisen. To oblige National Union's request would be to force J.R. Clarkson into arbitrating a dispute it never agreed to arbitrate, in contravention of well-settled law.

Second, National Union attempts to force arbitration for disputes that are completely undefined, not obviously ripe, and only speculatively within the "narrow" arbitration clause of the Pre-1989 Indemnity Agreements. Those agreements contain an arbitration clause, but only as to a narrow class of disputes. It is a bedrock principle that "arbitration is a matter of contract and therefore a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (citations omitted). If forced to arbitrate putative disputes that do not clearly relate to the "interpretation" of the Agreements, J.R. Clarkson would be forced to arbitrate issues it never explicitly agreed to arbitrate. J.R. Clarkson would thus incur irreparable harm. *See Washington Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121, 129 (D.D.C. 2015) (finding that organization would be irreparably harmed if forced to arbitrate issues "beyond the scope" of the contract).

As a result, the balance of hardships weighs in J.R. Clarkson's favor. A brief stay of arbitration efforts pending full resolution of J.R. Clarkson's counterclaim in the Coverage Action will inflict modest postponement of resolution, not measurable harm on National Union. *See, e.g.*,

*Interactive Brokers, LLC v. Duran*, No. 08-CV-6813, 2009 WL 393827, at *6 (N.D. Ill. Feb. 17, 2009) (the balance of hardships tips in favor of the party seeking to enjoin arbitration where "a preliminary injunction simply [would] delay the arbitration in its early stages until [the] Court conclusively decides the underlying issues.").

## <u>CONCLUSION</u>

For the foregoing reasons, J.R. Clarkson respectfully requests that the Court issue an order enjoining National Union from proceeding on either category of arbitration set out in its August 25, 2023 Arbitration Demand; and a declaratory judgment in favor of J.R. Clarkson that it did not agree to arbitrate National Union's putative disputes.

Dated: November 21, 2023

     New York, NY

Attorneys for the Petitioner,

*The J.R. Clarkson Company LLC*

By: *<ins>/s/ Paul T. Moura</ins>*

LATHAM & WATKINS LLP

Paul T. Moura
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
paul.moura@lw.com

Robert J. Gilbert (*pro hac vice* forthcoming)
Nathan A. Sandals (*pro hac vice* forthcoming)
Caitlin E. Feeney
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
robert.gilbert@lw.com
nathan.sandals@lw.com
caitlin.feeney@lw.com